NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 103

No. 2014-063

| | |
|---|---|
| Plum Creek Maine Timberlands, LLC | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Essex Unit, |
| | Civil Division |
| | |
| Vermont Department of Forests, Parks and Recreation and Vermont Department of Taxes | December Term, 2014 |

Mary Miles Teachout, J.

David L. Grayck of Cheney Saudek & Grayck P.C., Montpelier, for Plaintiff-Appellee.

William H. Sorrell, Attorney General, and Bridget C. Asay and Kyle H. Landis-Marinello, Assistant Attorneys General, Montpelier, for Defendant-Appellant.

Robert E. Woolmington of Witten, Woolmington, Campbell & Bernal, P.C., Manchester Center, for Amicus Curiae Vermont Land Trust, Inc.

C. Daniel Hershenson of Hershenson Carter Scott & McGee, P.C., Norwich, for Amici Curiae Vermont Forest Products Association and the Vermont Forestry Foundation.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **REIBER, C.J.**   This appeal concerns a timber harvest by landowner Plum Creek Maine Timberlands, LLC in forestland enrolled in the current-use, tax-incentive program. The Vermont Department of Forests, Parks and Recreation (FPR) issued an adverse inspection report, concluding that Plum Creek violated its forest-management plan and failed to comply with minimum acceptable standards during the harvest. Consequently, the Department of Taxes removed the land from the current-use program and levied a tax assessment. Following Plum Creek's appeal, the superior court reversed those administrative decisions. FPR now appeals,

arguing that the superior court failed to give appropriate deference to FPR's determination of the proper methodology for measuring compliance with the forest-management plan. We reverse the court's decision, and remand.

¶ 2. The property in question consists of approximately 56,600 acres in northeastern Vermont. Formerly part of the Champion International Corporation holdings, the land was sold in 1998 to the Essex Timber Company. Essex Timber enrolled it in the Use Value Appraisal (UVA), or current-use, program. This tax-incentive program was designed to "encourage and assist the maintenance of Vermont's productive agricultural and forestland" by taxing property enrolled in the program at its "current use" value rather than its fair market value. 32 V.S.A. §§ 3751, 3756(a). To be eligible for the program, forestland must be "under active long-term forest management . . . in accordance with minimum acceptable standards for forest management." Id. § 3752(9)(A). "Minimum acceptable standards for forest management" are defined as standards set by FPR. Id. § 3752(13). Eligibility also generally requires compliance with "the regulations adopted by the [Current Use Advisory] Board." Id. § 3755(a). The UVA Program Manual adopted by the Board[1] sets forth minimum standards for forest-management plans, minimum standards for forest management and regeneration, standard forms for use by landowners enrolled in the program, and appendices containing additional guidance for foresters and landowners.

¶ 3. To enroll in the UVA program, a landowner must file a "forest management plan" and obtain the approval of FPR, which is tasked with periodically reviewing the plan and inspecting each enrolled parcel. Id. § 3755(c). If upon inspection FPR "finds that the management of the tract is contrary to the . . . forest management plan, or contrary to the

---

[1] Comprised of the Commissioner of Taxes, the FPR Commissioner, the Director of the Department of Taxes, Division of Property Valuation and Review (PVR), members of the private agricultural and forestry sectors, and local government representatives, 32 V.S.A. § 3753(b), the Board's legislatively defined duties are to periodically review the criteria for enrollment in the UVA program, recommend changes and improvements, and adopt rules to carry out its statutory goals. Id. § 3754(a), (c).

2

minimum acceptable standards for . . . forest management," it is required to file an "adverse inspection report" with the landowner and the PVR Director. Id. When a report is filed, the PVR Director, in turn, is required to "remove from use value appraisal an entire parcel of managed forestland and notify the owner." Id. § 3756(i). This appeal involves FPR's issuance of such an adverse-inspection report to Plum Creek.

I. Facts

¶ 4.    Essex Timber prepared a forest-management plan, which FPR approved in 2007. See 32 V.S.A. § 3755(b), (b)(1) (providing that "[m]anaged forestland" must be "subject to a forest management plan" to be eligible for enrollment in UVA program). The following year, Essex Timber sold its holdings to Plum Creek, which formally adopted the existing management plan.

¶ 5.    Under a strategy developed by FPR to accommodate large landowners, Plum Creek's forest-management plan provided more conceptual, and less stand-specific, information than is generally required by FPR for participation in the UVA program. When an actual timber harvest is planned, however, the landowner must submit a "harvest prescription amendment" to the management plan containing more detailed information, and obtain the approval of the county forester for this amendment.

¶ 6.    In 2009, Plum Creek sought to harvest timber for six stands in its managed forestland and worked with the county forester for Caledonia and Essex Counties to adopt a prescription amendment to its management plan. The plan set both numerical and qualitative goals for each stand to be harvested. Those goals were memorialized in a prescription amendment. For the three stands at issue in this appeal, the prescription provided the following. Stand 34 was to receive a two-staged shelterwood[2] and the target residual basal area (RBA)—the amount of tree stock left after cutting—was set at 30-40 ft$^2$. Stand 43 also was to receive a two-

---

    [2]    A shelterwood cut reduces the basal area to create the particular microclimate conditions necessary to regenerate certain species within the stand.

3

staged shelterwood cut and some overstory removal and the target RBA was 60 ft$^2$. Stand 44 was to receive intermediate thinning with a target RBA of 60 ft$^2$.

¶ 7.    In late January 2010, after cutting had begun, the county forester visited the site with several other individuals including Plum Creek's forester, an FPR forester, and a forester from the Vermont Land Trust to review the harvest's progress. The county forester expressed concern about the level of cutting in Stand 34. Trees, which had been marked for retention, had been cut, and this sight "raised alarm with everyone as it suggested excessive cutting in disregard of the prescription." Based on the observations of cutting, all, including Plum Creek's forester, were concerned about the level of cutting and whether the proper outcome could be met if logging continued. The county forester also observed several violations of the Acceptable Management Practices (AMPs), which are designed to protect water quality during logging operations. The AMPs violations included the siting of equipment too close to water, improper stream crossings, and mud and sediment where equipment had crossed a stream. In response, Plum Creek's forester went to the home of the contracted logger and stopped all cutting in Stand 34. Subsequently, Plum Creek worked to correct the AMPs violations by removing the crossings and remediating the sites deemed to be contrary to the AMPs.

¶ 8.    In early February 2010, Plum Creek suspended the entire harvest pending further investigation. Later that month, the county forester visited the site again with two other state officials: FPR's forester in charge of AMPs compliance and the Agency of Natural Resources (ANR) officer for AMPs enforcement. In a letter to Plum Creek written shortly thereafter, the FPR forester identified several additional AMPs violations involving erosion controls, logging debris, stream crossings, seeding and mulching, and protective strips along streams. The letter detailed the necessary remediation measures and closed with the observation that FPR's intentions were to ensure remediation in a timely manner and to educate Plum Creek's logging operators so that they could "implement proper practices in the future."

4

¶ 9. In the course of additional site visits in March and April 2010, the county forester measured the RBA in the harvested portions of the stands. The county forester issued an adverse-inspection report identifying violations in Stands 34, 43, and 44 consisting of "cutting contrary to the approved forest management plan," as well as practices contrary to the AMPs. His cut contrary finding was based on the following measurements. The county forester calculated that the RBA for 91 harvested acres of the 137 acres in Stand 34 as 19.7 $ft^2$, well below the prescription level of 30 to 40 $ft^2$. He determined that the RBA for 40 harvested acres in Stand 43 was 23.3 $ft^2$, below the prescription target RBA of 60 $ft^2$, and that the regeneration goal was not met with only 15% of the plots stocked. In Stand 43, the county forester also found that the harvest had failed to meet the prescription's tree-regeneration goal, which called for a "Two Staged Shelterwood . . . and Overstory Removal (OSR)" with the goal of "releas[ing] quality growing stock and provid[ing] gaps to promote regeneration." The county forester determined that the RBA for the 8 harvested acres in Stand 44 (out of a total of 37) was 16.3 $ft^2$, again below the prescription's target level of 60 $ft^2$.

¶ 10. Related to the AMPs violations, FPR's forester for AMPs compliance sent a letter to Plum Creek confirming that he had inspected the sites of the previously identified AMPs violations and had "observed that all of the major remedial actions relating to the AMPs violations have been accomplished" and that Plum Creek was now in compliance with the AMPs.

¶ 11. In May 2010, FPR informed Plum Creek that it had forwarded the county forester's report to PVR, see 3 V.S.A. § 2289(a), with the recommendation "that the property be removed from UVA for harvesting contrary to the management plan." In July 2010, PVR notified Plum Creek that, based on the adverse-inspection report, its "entire parcel" had been removed from the UVA program. Plum Creek appealed that decision to the PVR Director

5

pursuant to 32 V.S.A. § 3758(a),[3] contesting removal of the entire 56,604-acre tract from the program rather than the 470 acres that comprised the harvest area. Plum Creek also appealed the adverse-inspection report to the Commissioner of FPR pursuant to 32 V.S.A. § 3758(d).

¶ 12. The FPR Commissioner provided an informal hearing at which no evidence was taken and of which there is no transcript or audio recording.[4] Plum Creek provided "remarks" by its lawyer and two employees and also sent a written argument. Apparently, the county forester also was present, although it is not clear that he provided any information in the presence of the Plum Creek representatives.

¶ 13. The FPR Commissioner upheld the adverse-inspection report, concluding that the cutting was contrary to the forest-management plan. The Commissioner examined the evidence supplied by the county forester and concluded that both the evidence and the methodology were sound. The Commissioner found that the data was collected appropriately and compliance was measured according to the correct methodology. Plum Creek argued that there were no grounds for the violation because harvesting was suspended before the entire stand was cut. Plum Creek proffered that if cutting had continued, then the final RBA for the entire stand could have been in compliance. In the alternative, Plum Creek asserted that if RBA was measured by averaging the treated and untreated areas of the stands, it would meet the plan goals.

¶ 14. The Commissioner rejected these arguments. The Commissioner explained that it was not necessary to wait for the entire stand to be cut before bringing a violation and that if only

---

[3] As the statute existed in 2010 when the appeal was taken, the aggrieved party appealed from the PVR Director, who formally removed the property from the UVA program, to the same Director. See 2007, No. 190 (Adj. Sess.), § 4. The statute now states that the appeal goes from the PVR Director to the Commissioner of Taxes.

[4] The statute provides no specificity on how the appeal is to be conducted. While the Vermont Administrative Procedure Act (APA) specifies procedures for many types of administrative proceedings, its regulation is generally applicable only to contested cases, see 3 V.S.A. §§ 809-813, which are defined as proceedings in which "legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for a hearing," id. § 801(a)(2). There is no requirement that the appeal to the Commissioner provided in § 3758(d) be determined after an opportunity for a hearing. Thus, the APA does not apply to the appeal to the Commissioner, and this was an informal adjudication.

6

a portion of the stand was cut, then compliance should be measured by focusing on the harvested area. The Commissioner acknowledged that the stand is the typical unit for measuring RBA, but explained that focusing on the cut area of the stand was in keeping with forestry practices. After a portion of the stand was cut, this effectively created a new stand because the treated and untreated portions had different distribution, composition, and structure, and therefore the Commissioner concluded that it was appropriate to evaluate them separately. The Commissioner clarified that compliance with the prescription amendment was assessed by looking at the qualitative attributes of the parcel and not just by measuring stocking levels. Therefore, it would make no sense to include the uncut portions of the stand in measuring compliance because the goals of the prescription could not be met in the untreated portion of the stand. For example, in Stand 34, a shelterwood cut was prescribed. This was obviously not achieved in the uncut area where no harvesting occurred. Further, the Commissioner found that the goal was not achieved in the cut area where the RBA of 19.7 was essentially a commercial clear cut. The Commissioner rejected Plum Creek's assertion that these two could be averaged to achieve a numerical RBA that would be within the prescription goal. The Commissioner also upheld the AMPs violations, noting that they were observed in the field by all parties.

¶ 15. The FPR decision was reported to the Department of Taxes. In March 2011, the PVR Director issued a decision on Plum Creek's appeal, upholding the decision to remove Plum Creek's entire parcel of 56,604 acres from the UVA program, and levying an assessment of a land-use change tax in the amount of $7,860.80.

¶ 16. Pursuant to 32 V.S.A. § 3758(a) and (d), Plum Creek appealed both administrative rulings to the superior court, which consolidated them for review.[5] Following pretrial briefing, the court held an evidentiary hearing over the course of several days in May and June 2013.

[5] Because the Plum Creek tract lies in both Essex and Orleans counties, there were actually four administrative rulings, two from each county. All of these rulings were consolidated on appeal.

7

¶ 17.  Plum Creek presented testimony from a forestry expert, Mr. Holleran, who testified that the cutting was in compliance with the prescription amendment.  Mr. Holleran is a forester, who had assisted landowners in managing land that is in the UVA program, but who had no prior involvement in the management of Plum Creek's land and acknowledged at trial that he had never prepared a forest-management plan for a large landowner similar to the type of plan used by Plum Creek.  Mr. Holleran presented evidence to advance the same argument Plum Creek made before the Commissioner—that RBA targets were achieved if the RBA was measured across both the treated and untreated portions of each stand.  He testified that this was the appropriate calculation because the stand was the accepted unit of measure for RBA compliance.  He submitted four written analyses of the harvest based upon several site visits in the fall of 2011 and 2012, and also testified at length in support of his conclusion that the harvest was in compliance with the amended management plan and forest-management standards.

¶ 18.  The county forester also testified and described his sampling method.  He explained that the cut areas were not in compliance with the forest-management plan either quantitatively—because the measurements of RBA were well below the targets set, or qualitatively—because the observation of the regrowth and condition of the stand did not meet the expectations in the prescription.

¶ 19.  The court issued a written decision in January 2014.  As to the compliance with the forest-management plan, the trial court framed the issue as an evidentiary question.  The court explained that measuring RBA was not within the exclusive expertise of FPR because it is something that foresters do all the time; therefore, the court determined it was free to decide the relative credibility of each expert's method for how to measure RBA when only part of the stand had been harvested.  The court stated that the county forester's methodology "was not incorrect" and was consistent with "manual standards."  Nonetheless, the court found that Plum Creek's expert provided superior evidence, which was more credible than the state forester's.  The court thus adopted Plum Creek's expert's view that RBA should be measured across the entire stand

8

and found, based on that the expert's calculations of RBA in those areas, that the harvest was in compliance with the forest-management plan. Consequently, the court concluded that the adverse-inspection report was not justified on this basis.

¶ 20. The court further found that, although several AMPs violations were identified immediately after the harvest, they were promptly remediated to the satisfaction of the FPR forester responsible for AMPs compliance, and that there was no evidence of any residual harmful effect on water quality. The court noted, "There is no evidence that there was anything more than a few temporary violations of the sort not uncommon in logging operations." The court concluded that the adverse-inspection report was not warranted based on these AMPs violations.

¶ 21. Because the decision by PVR to remove the tract from the UVA program was predicated on the adverse-inspection report, the court concluded that the Tax Department's ruling must be reversed as well. This appeal by the State followed.

II. Standard of Review

¶ 22. The State first contends the superior court erred by failing to accord sufficient deference to the methodology adopted by FPR to determine compliance with the forest-management plan. As a threshold matter, therefore, we consider whether the court applied the correct standard of review. The question of the appropriate standard of review is a legal one that we consider de novo. In re Soon Kwon, 2011 VT 26, ¶ 5, 189 Vt. 598, 19 A.3d 139 (mem.).

¶ 23. The UVA statute provides that an appeal from FPR's decision to the superior court is to be in "the same manner and under the same procedures" as a property tax appeal. 32 V.S.A. § 3758(d). Those appeals are filed pursuant to Rule of Civil Procedure 74,[6] and are de novo. 32 V.S.A. §§ 4461(a), 4467.[7]

---

    [6] Rule 74 also specifically provides that the rules of civil procedure "shall govern proceedings" in the superior court. V.R.C.P. 74(g). In a departure from Rule 74(e), however, which authorizes trial by jury on "[a]ny question as to which there is a right to trial by jury," the

9

¶ 24. This Court established the proper standard of review for appeals to the superior court from an FPR current-use decision in <u>Jones v. Department of Forest, Parks & Recreation</u>, 2004 VT 49, 177 Vt. 81, 857 A.2d 271. In that case, we explained that factual findings are reviewed for "clear error," but "substantial deference" is given to FPR's determinations within its "area of expertise." <u>Id</u>. ¶ 7. Thus, FPR's decision as to a violation should be upheld unless "the Department's finding of a violation . . . was standardless, unsupported by the evidence, or contrary to law." <u>Id</u>. ¶ 14.

¶ 25. The basic framework for the standard of review is not altered simply because in this case there was a de novo evidentiary hearing in the superior court. Because the superior court has conducted a de novo hearing, as factfinder, the court's factual findings are reviewed for clear error. As to questions of policy, however, agency determinations regarding the proper interpretation of policy or methodology within the agency's expertise are entitled to deference, even where there is a de novo hearing in the superior court. <u>ANR Permits</u>, 2014 VT 50, ¶ 15-16. "[D]ecisions made within the expertise of such agencies are presumed correct, valid and reasonable." <u>Id</u>. ¶ 15 (quotation omitted).

statute provides that tax appeals to the superior court "shall be heard without a jury." 32 V.S.A. § 4461(a).

[7] The dissent claims that the standard of review is misidentified, but the dissent largely agrees with the standard articulated here. Review is de novo in the trial court. We emphasize, as we have done in the past in the context of property tax appeals, that although the appeal is de novo this does not mean that the trial court "ultimately owes no deference to the decision of the administrative agency." <u>Mollica v. Div. of Prop. Valuation & Review</u>, 2008 VT 60, ¶ 8, 184 Vt. 83, 955 A.2d 1171; see <u>In re ANR Permits in Lowell Mountain Wind Project</u>, 2014 VT 50, ¶¶ 9-17, 196 Vt. 467, 98 A.3d 16 (explaining that even though review was de novo to public service board, board was still required to defer to agency's interpretation of matters within its area of expertise). Even in the context of de novo review, a court must still defer to an administrative agency's interpretation of a matter within its "legislatively delegated expertise." <u>Mollica</u>, 2008 VT 60, ¶ 9.

The true point of divergence between this decision and the dissent is whether the critical question on appeal is an area within the agency's expertise to which the trial court must defer or a factual determination for the trial court to decide. Because the key inquiry depends on the "proper methodology for implementing a statute" within the purview of FPR, the agency's interpretation is accorded deference. See <u>Town of Killington</u>, 2003 VT 88, ¶ 5, 176 Vt. 70, 838 A.2d 91.

¶ 26. The critical inquiry is in determining whether an issue involves a question of fact, subject to the superior court's discretion as factfinder, or whether it is a matter of policy or methodology within the agency's area of expertise. Four major issues with respect to timber harvesting were contested before the superior court: (1) whether compliance should be measured across the stand as a whole or over only the cut-specific areas; (2) the numerical RBA measurements in the sub-stand areas; (3) whether tree-regeneration measurements should be taken three years after the harvest or immediately after the harvest; and (4) whether a box on a map of Stand 43, labeled "OSR" for overstory removal, meant that OSR could occur only in the box area.

¶ 27. We need not go beyond the first issue to resolve this appeal because although the experts' calculations of RBA in the harvested portions of the stands differed, both measured the RBA in those areas below the target levels. The measurements of the two experts are summarized in the following chart:

| Stand Number | Area of Stand (acres) | Area Cut Contrary (acres) | Basal Area Prior to Logging $(ft^2)$ | Target RBA $(ft^2)$ | State Forester Calculation of RBA in Cut Area $(ft^2)$ | Plum Creek Calculation of RBA in Cut Area $(ft^2)$ | Plum Creek Calculation of RBA across entire stand $(ft^2)$ |
|---|---|---|---|---|---|---|---|
| 34 | 137 | 90.91 | 82 | 30-40 | 19.7 | 28.5 | 47.4 |
| 43 | 115 | 40.15 | 88 | 60 | 23.3 | 53.1 | 73.5 |
| 44 | 37 | 8.47 | 97 | 60 | 16.3 | 36 | 107 |

Thus, the main difference in their opinions of whether a violation occurred was the proper methodology for calculating RBA. Plum Creek's expert testified that the stand was the unit of measurement and therefore RBA should be measured across the entire stand, regardless of whether the entire stand had been harvested. In keeping with the methodology adopted by the FPR Commissioner, the county forester measured RBA by looking solely at the harvested area of each stand.

¶ 28. The superior court viewed the question of how RBA should be measured for purposes of determining compliance with the forest-management plan as a question of fact, not an area of agency expertise entitled to deference, and compared the relative credibility of the experts to determine how to measure compliance. As explained more fully below, this was error. FPR's decision on the methodology for determining compliance was entitled to deference, and Plum Creek had the burden to show it was " 'wholly irrational and unreasonable in relation to its intended purpose.' " ANR Permits, 2014 VT 50, ¶ 17 (quoting Town of Killington, 2003 VT 88, ¶ 6).

¶ 29. Like other cases where this Court has applied a deferential standard of review to an agency decision, in this case, deference is due because the methodology for determining compliance is an area over which FPR has broad statutory authority and the relevant expertise. See id. ¶ 16 (explaining that agency is entitled to deference where decision is within agency's area of expertise and within statutory authorization); In re Williston Inn Grp., 2008 VT 47, ¶ 13, 183 Vt. 621, 949 A.2d 1073 (mem.) (explaining that where Legislature entrusts implementation of statute to agency, this Court gives deference to agency's interpretation of those laws). The statutory scheme underpinning the current-use program contains the standards to be applied to all UVA-enrolled land and highlights the importance of oversight by FPR. FPR is entrusted with the authority both to set standards for acceptable forest management and to enforce compliance with those standards. See 32 V.S.A. § 3752(9)(B)(iii) (defining "managed forestland" as property that is managed in accordance with standards established by FPR); id. § 3755(c) (entrusting FPR with power to determine if "management of the tract is contrary to the conservation or forest management plan" and to issue inspection report if it so finds). Consequently, FPR is entitled to deference in determining how to measure compliance. This is exactly what this Court recognized in Jones, 2004 VT 49, ¶ 14 (giving deference to FPR on decision regarding violation of forest-management plan).

12

¶ 30. The superior court in essence determined that Plum Creek's methodology was better than FPR's. This is not the role of the court. "We have cautioned that courts are not 'a higher environmental agency entrusted with the power to make environmental law and policy,' but rather exercise a 'narrow role in ensuring that the decisions of ANR are made in accordance with law.' " Id. ¶ 14. Where there are questions about "complicated methodologies within an agency's expertise" a reviewing court, even in the context of a de novo hearing, must give deference to the agency's decision. ANR Permits, 2014 VT 50, ¶ 16.

¶ 31. In assessing the validity of FPR's violation, the trial court and this Court on appeal must give deference to FPR's methodology. This does not mean that FPR's decisions will be rubber-stamped, but deference is accorded. "Absent a clear and convincing showing to the contrary, decisions made within the expertise of such agencies are presumed correct, valid and reasonable." In re Johnston, 145 Vt. 318, 322, 488 A.2d 750, 752 (1985). Review is limited to whether there was a "reasonable basis" for the agency action. Id.; see In re DeCato Bros., Inc., 149 Vt. 493, 496, 546 A.2d 1354, 1356 (1988) (explaining that agency decision must meet minimum standard of reasonableness).

### III. Measurement of Compliance

¶ 32. In light of this standard of review, we turn to the question of whether the Commissioner's decision on methodology had a reasonable basis sufficient to satisfy review.

¶ 33. The Commissioner provided the following reasons for adopting a policy of determining compliance by limiting the calculation of RBA to the area that had been harvested.[8]

---

[8] The dissent repeatedly comes back to the fact that cutting was halted partway through and laments that there would be no conflict about how to measure RBA "if the timber harvesting was completed in the three stands." Post, ¶ 125. Obviously, if cutting had been completed, then the issue of whether to measure RBA in the entire stand or just in the cut portion would not exist. The fact is that cutting did cease. The dissent sees this as an injustice to Plum Creek, and places blame on the State for declaring a violation before the harvest was completed. The dissent accuses the majority of appellate factfinding on the issue. There is no need to engage in appellate factfinding. To the extent that it is relevant, the court made sufficient findings on the issue. The trial court found, based on the evidence presented, that it was Plum Creek's forester that initially told the logger to cease cutting based on the forester's own concern about the level

The Commissioner acknowledged that the typical unit for forest management is the stand, but concluded that where areas of the stand receive different treatment a new stand may be created. The Commissioner explained:

> Although the unit of measure for forest management purposes and UVA is the "stand," management can alter the unit enough to create different stands. As a "stand" is a contiguous group of trees sufficiently uniform in age-class distribution, composition and structure, and growing on a site of sufficiently uniform quality, to be a distinguishable unit, the harvesting in stand 34 has created two separate stands as that area harvested has a very different age-class distribution, composition and structure now compared to that area left untreated. They are no longer the same stand; therefore, they should be sampled and evaluated separately.

In other words, because part of the stand had been cut while the remaining acres were left untouched after cutting was halted, the Commissioner determined that the cut areas should no longer be considered part of the existing larger stand and should be evaluated separately from the uncut areas.

¶ 34. Moreover, the Commissioner explained that averaging the basal area of the logged and unlogged portions did not portray an accurate picture of whether the goals and objectives of the prescription were met. This assessment is well illustrated by Stand 34, for which the prescription called for a shelterwood cut to target sugar maple and yellow birch with large crowns for retention, and set a target RBA of thirty to forty. The Commissioner explained that the purpose of the cut was to create the correct light levels and soil moisture on the ground to promote seed germination and seedling establishment. The Commissioner explained just looking at an average of the stocking level across the untreated and treated portions of the stand produced an inaccurate picture of whether this goal was met. As the Commissioner stated, "The notion that the goals and objectives of the shelterwood treatment were met by considering shade

---

of cutting he observed during the site visit in late January. Whether Plum Creek then continued to suspend cutting voluntarily or felt compelled by concerns expressed by ANR and FPR is not relevant. Plum Creek did not claim compliance based on future cutting; rather, it based compliance with the prescription on the fact that the RBA, if averaged between the cut and uncut portions of the stand, was within the goals set.

14

from trees over a kilometer away (in the uncut portion of the stand) as providing the necessary microenvironmental condition is a misapplication and a complete misunderstanding of the principle of the silvicultural practice."[9]

¶ 35. We conclude that the Commissioner's decision to determine violations by measuring compliance, both quantitatively and qualitatively, solely in the cut area of the stand was reasonable, and not "standardless, unsupported by the evidence, or contrary to law." Jones, 2004 VT 49, ¶ 14.

¶ 36. First, it is a method that promotes the overall policy of the UVA program, which is to maintain productive forestland and to prevent accelerated use. 32 V.S.A. § 3751. If RBA for purposes of compliance could be measured by averaging harvested and unharvested portions of a stand, then cutting, which offends the protection and proper use purposes, could not be prevented because it could still technically comply with numerical prescribed RBA targets. For example, if a prescription provides for a shelterwood cut and sets a moderate RBA target, then the target RBA could be met by clear cutting half of the stand and leaving the other half fully forested and untreated. While numerically this would meet the prescribed RBA under Plum Creek's methodology, it certainly would not protect forestland or prevent accelerated use. Id. It also would not achieve the qualitative goals of the shelterwood prescription necessary for the desired tree growth.

---

[9] The dissent dismisses this concern and asserts that Plum Creek never intended to harvest only part of the stand and its position "has always been that the harvest could not be judged in midstream and should have continued to its end." Post, ¶ 126. It has not "always" been Plum Creek's position that the harvest should continue; Plum Creek voluntarily chose to stop the harvest based on an assessment by its own forester that the logger was not following its directions. Further, Plum Creek did not base its alleged compliance with the prescription goals on a continued cutting plan but alleged it complied with the prescription goals if the RBA was calculated by averaging the cut and uncut portions of the stand. Plum Creek's own expert in the superior court testified that if the entire stand had been cut in the same manner as the already harvested portion, it would have been out of compliance.

15

¶ 37.    Second, restricting measurement to areas already harvested is logical.  RBA is a measure of the <u>residual</u> basal area in a stand, which by definition refers to the basal area left after harvest.  It is simply not logical to purport to measure RBA in an untreated, unharvested area.

¶ 38.    Third, measuring compliance in the cut areas allows for more effective oversight by FPR.  If a violation cannot be based solely on observations and measurements taken in the portion of the stand already harvested, then FPR will have to wait for an entire stand to be cut contrary before bringing a violation.  For large stands, this could have drastic consequences.  Plum Creek's expert recognized in this case that if the harvest in Stand 34 had continued in the rest of the stand in the same manner, the entire stand would have been out of compliance.  Surely, FPR was not required to wait for those additional forty acres to be clear cut before bringing a violation.[10]

¶ 39.    Fourth, it is a method consistently used.  As the Commissioner noted, this is how other violations have been calculated.  Indeed, it is wholly in keeping with our decision in <u>Jones</u>, in which this Court determined that FPR acted within its discretion in limiting its analysis of whether a violation occurred to the portion of the stand that was cut.  2004 VT 49, ¶ 13.

¶ 40.    There is no merit to the trial court's concern that because basal area is generally measured across a stand, a landowner would not be on notice that a violation could be brought for overcutting in one area of the stand.  The landowner is on notice that the harvest prescription must be met—both qualitatively and quantitatively—across the entire stand.  Further, as demonstrated by <u>Jones</u> and the record in this case, FPR has previously determined compliance by measuring RBA solely in cut portions of the stand.

¶ 41.    Plum Creek failed to demonstrate that the Commissioner's methodology was "wholly irrational and unreasonable in relation to [the UVA statute's] intended purpose."  <u>ANR Permits</u>, 2014 VT 50, ¶ 17 (quotation omitted).  Plum Creek's expert's explanation for why he

_____

[10]  Especially in a situation like this where Plum Creek voluntarily ceased cutting, FPR should not have to wait indefinitely to see if and when the landowner will continue cutting before bringing a violation.

took the measurement across the entire stand was simply that "the stand is the unit of measure for forest management." He did not provide an explanation of why this was appropriate for a stand that had been only partially treated. He did not provide a clear answer as to whether a landowner could be in compliance with a forest-management plan by clearcutting half of a stand and leaving half of the stand untouched to reach a particular numerical RBA average. In fact, he failed to explain how he could be assured that once cutting was resumed in the areas not yet cut that the stand would still be in compliance with the prescription.

¶ 42. For example, he testified that if the remaining uncut portion of Stand 34 was harvested to a density of 60, then even taking the county forester's measurement of 19.7 for the cut portion, the entire stand would still be within the prescription of 30 to 40 RBA. There was no assurance, however, that such density would be achieved in the remaining portion and there was no evidence that cutting the remaining portion of Stand 34 to a density of 60 would achieve the goals of the prescription by creating the necessary microclimate conditions on the ground. In response to the question of whether two stands had been created by the cutting, Plum Creek's expert answered "that's a complicated question." He acknowledged that that could happen, but felt that for evaluating the prescription, the measurement should be made for the entire stand. While this may be true if the entire stand had received the same treatment, FPR provided reasonable and logical reasons why RBA should be calculated based solely on the part of the stand that had already been cut.

¶ 43. Further, that FPR's methodology in limiting its assessment to the cut area was a logical and reasonable measurement of whether the prescription plan had been followed was acknowledged by Plum Creek's expert to some degree. In response to the question of whether the goal of treatment for Stand 44 was met qualitatively, he answered that the prescription was met only in the harvested area. This is logical because obviously the conditions in the uncut areas were unchanged and therefore could not have met the goals of the cut. It also creates, however, an inconsistency in the evaluation method used by Plum Creek's expert. If the

17

qualitative assessment of whether the forest-management plan was met must be limited to the area cut, then how can the quantitative assessment include the entire stand? FPR's decision to limit both its qualitative and quantitative assessments to the cut areas was both consistent and reasonable.

¶ 44. Given that both experts calculated the RBA in the cut areas of Stands 34, 43, and 44 below the targets set in the forest-management plan, we conclude that this failure to meet the targets was an adequate basis for issuing the adverse-inspection report, and therefore that the trial court erred in reversing it.

### IV. AMPs Violations

¶ 45. In addition to a finding that the stands were cut contrary to the forest-management plan, the adverse-inspection report was also based on findings that Plum Creek failed to implement AMPs. The Commissioner upheld the adverse-inspection report in both respects. The trial court concluded that there was no violation of the forest-management plan and that the AMPs violations were insufficient on their own to justify an adverse-inspection report. The court found that—although "there were [AMPs] violations"—there was "no evidence that [they were] anything more than a few temporary violations of the sort not uncommon in logging operations"; that there was "no evidence" of any residual "detrimental impact on water quality of the type the AMPs are designed to prevent, despite the violations"; and that there was also no evidence of residual "harm to . . . wildlife or soil erosion." The court noted, in this regard, that the FPR forester overseeing AMPs compliance determined that Plum Creek had remediated the violations within a few months of their discovery, and that the ANR official in charge of AMPs enforcement undertook no enforcement action.

¶ 46. On appeal, the State argues that the superior court's finding that Plum Creek violated several of the AMPs protecting water quality compelled affirmance of the Commissioner's decision upholding the adverse-inspection report. Having concluded that the adverse-inspection report was warranted based on Plum Creek's violations of the forest-

18

management plan, we need not and do not reach the question of whether the AMPs violations would have provided a sufficient independent basis to issue an adverse-inspection report.

## V. Conclusion

¶ 47. In sum, we reverse the superior court and reinstate the adverse-inspection report as upheld by the FPR Commissioner. We remand to the superior court to consider the questions raised in Plum Creek's appeal of the PVR Director's decision removing land from the UVA program and leveling a tax assessment against Plum Creek.

Reversed and remanded.

_____
Chief Justice

¶ 48. **DOOLEY, J., dissenting.** On January 15, 2010, the Vermont Department of Forest, Parks and Recreation (FPR) approved logging on land owned by Plum Creek pursuant to a plan drafted and submitted by Plum Creek. Logging apparently proceeded quickly because on January 26, 2010, the staff forester of Plum Creek, the FPR county forester, along with others, visited a harvest of trees on part of Plum Creek's forestland. The date of the visit was apparently arranged so that all could attend and the logging would be in progress; there was no significance to how much of the harvest had been completed, how much was left to complete or where in the forest the contract loggers were working. The site visit was to three "stands," defined and mapped out areas of the forest. A majority of the harvest had already occurred on two stands, while only 20% of the area in the third stand had been logged, although this stand was much smaller than the other two. During the site visit the FPR county forester indicated that he believed that the areas he saw were being "cut contrary," that is, contrary to the plan Plum Creek submitted and FPR approved.

¶ 49. At that point, all logging work stopped. The forestland in the three stands became the equivalent of a "crime scene." Over time, the county forester went back and took

19

measurements of what had been cut in relation to the specifications in the plan. On April 26, he issued an adverse-inspection report recommending that Plum Creek be terminated from the current-use program. The FPR Commissioner accepted the recommendation, and this controversy unfolded. Plum Creek hired a professional forester to independently evaluate the state of the forest and the allegations of the county forester. Part of the evaluation was to measure regeneration three years after the harvest was terminated. The case proceeded to trial in the superior court, and the court took a view of the stands in the condition they were when logging stopped. Plum Creek took many pictures of the forest at that time, many of which were introduced into evidence. As far as the record before us discloses, the land and forest in controversy is in exactly the same state today as when the site visit occurred over six years ago.

¶ 50.   I start with this short story to make three points to which I will return. First, the amount of the land that had been logged has no significance, other than that it was frozen at the time of the site visit. The timeline shows, however, that the entire harvest would have been over in a matter of days if it had been allowed to run its course. Second, no one has claimed that Plum Creek did anything illegal, whoever one might believe in this controversy, so my comparison to a "crime scene" is a purely hypothetical one.[11] The sole issue is whether Plum Creek complied with its plan and whether, as a result, it can receive the substantial monetary benefit of the enrollment of 56,604 acres of forestland in the current-use program.[12] Third, Plum Creek's decision to stop the harvest was required by the county forester's declaration that Plum

___

[11] The State alleged that Plum Creek had violated the Acceptable Management Practices (AMPs) for Maintaining Water Quality on Logging Jobs by a number of actions. The alleged violations were corrected shortly after they were identified. The AMPs violations were one of the grounds for the termination of Plum Creek from the current-use program and could have been grounds for the State to seek civil penalties in an enforcement action. It did not do so and, in fact, certified that Plum Creek was in compliance with the AMPs. Neither the majority nor this dissent has considered the AMPs compliance issue, except as stated in infra, ¶¶ 126-132, to explain why Plum Creek was prevented by FPR from finishing the harvest.

[12] Although the alleged improper conduct affected only a few hundred acres of land, all contiguous land owned by Plum Creek was removed from the current-use program. Although the exact financial impact of the decision is not of record, it is alleged to be well in excess of one million dollars.

Creek had violated its plan and the AMPs requirements, the prospect of civil penalties and criminal liability for violating the AMPs requirements, the prospect that all its land would be removed from the current-use program, and most important a subsequent specific direction of FPR. The majority disagrees with this point, as shown by its three footnotes on the issue—ante, nn. 10, 11 and 12—and is acknowledging through these footnotes that the point is central to its rationale. Accordingly, I have added a separate section at the end of the dissent summarizing the facts that show why the majority's conclusion is wrong. See infra, ¶¶ 128-134. If Plum Creek had completed the harvest it would have had no evidence of the state of the harvest at the time of the forester's declaration, evidence that became critical in the defense of this case.[13]

¶ 51. My disagreements with the majority are deep and extensive and take many pages to fully explain. There are, however, three other points to which I will return on numerous occasions, and I summarize them here as a road map through this dissent. First, by statute, the standard for judicial review in this case is de novo, a standard that by definition provides the broadest and most extensive judicial review of administrative action. While the majority has paid lip service to that standard, it has actually employed the narrowest and most agency-deferential standard of review possible, turning the statutory standard into its opposite. If the standard of review were applied the way it is written, the superior court decision would be affirmed. In In re Town of Sherburne, we recognized in regard to the standard for review of administrative action that courts have a tendency to recite "a batch of verbiage and then pay[] no attention to what it has said in determining what to do." 154 Vt. 596, 607, 581 A.2d 274, 280

---

[13] The majority finds significant that Plum Creek "voluntarily ceased cutting" when concerns were raised. Ante, ¶ 38 n.10. I find significant that the county forester never stated that Plum Creek should complete its harvest and the forester would judge compliance based on the completed harvest. Also important is that FPR withdrew its approval for the harvest and only accepted that Plum Creek had resolved the AMPs issues after the termination decision was made. Despite Plum Creek's immediate letter indicating how it would proceed forward in compliance with the plan and to resolve the AMPs issues, the forester went forward with the termination action in this case and never answered the letter. If there was an attempt to settle this controversy, the evidence lies in the administrative record that was never disclosed.

(1990) (quoting 5 K. Davis, Administrative Law Treatise § 29:27, at 456-57 (2d. ed. 1984)). This is exactly what the majority has done here.

¶ 52. Second, the majority has reversed the decision of trial court, without a remand, holding that as a matter of law the agency must prevail. At best, this would be an unusual and exceptional action, particularly after four days of trial and extensive evidence and findings of fact, none of which are found to be erroneous. If the trial court employed the wrong standard of review, the remedy is to remand the matter to the trial court to apply the right standard in light of the evidence and findings of fact. After reading the majority opinion, it is difficult to see what the purpose of the trial was or whether Plum Creek's extensive evidence could even be considered. Indeed, it is hard to understand the purpose of judicial review at all.

¶ 53. Third, the sole question on which this case turns is whether Plum Creek violated a timber-harvesting plan that it drafted and the agency approved. I have attached the plan to this dissent. The superior court found that Plum Creek did not violate the plan. The State claims it did but does not identify the language in the plan it says was violated. The majority adopts the theory of the State because the State's interpretation of the plan is entitled to deference, again with no specific identification of the requirement in the plan that was violated. The result is that the State is entitled to create plan requirements as it goes along, with no advance notice to a landowner and no inclusion of the requirement in the plan document.

¶ 54. Having identified these recurring points, I agree with the majority that proper identification of the standard of review that governs the superior court's review of the decision of FPR to terminate Plum Creek from the current-use program is important, and much of this dissent is about the proper standard of review.

¶ 55. For an instant in its opinion, the majority acknowledges that the Legislature has established the standard of review of the administrative decision for this case as de novo. The leading treatise on administrative law states the "meaning of the de novo standard" as follows:

22

This standard tells a court to affirm the agency only if it agrees with the administrative conclusion either as to the entire administrative decision or some part of it. If the court does not agree, the court is instructed to substitute its own judgment.

C. Koch & R. Murphy, Administrative Law and Practice § 9.22[1] (3d ed. 2016).

¶ 56. This is exactly the meaning of de novo review that our decisions reflect. For example, in Town of Victory v. State, we rejected the application of de novo review in the absence of a legislative direction to use it because "[d]e novo review, whereby the superior court would simply substitute its judgment for that of the director, necessarily usurps power delegated to the executive branch; therefore that standard is inappropriate unless the statute expressly so provides." 2004 VT 110, ¶ 16, 177 Vt. 383, 865 A.2d 373 (emphasis added). As I discuss below, de novo review here means that judicial review is not based on the agency record; indeed, it could not be here because there is virtually no record. I recognize that we have adopted a presumption against de novo review when the review statute does not provide for it. Where, as here, the Legislature expressly provides for it, we must follow the legislative direction.

¶ 57. Instead of implementing this standard of review, the majority has adopted its own standard, unsupported by the governing statute, which is exactly the standard of review that we would adopt if de novo review was not commanded by the Legislature. Indeed, it is exactly the opposite standard of review, as narrow and limited as exists anywhere in our law. In doing so, it has emasculated judicial review, overturning a trial decision based on four days of trial without deciding that any of the findings of fact of the trial court are erroneous and without a remand for factfinding under what it views is the correct standard of review.

¶ 58. This is a case where under neutral standards, de novo review would be appropriate even if the Legislature was silent on the nature of review. There is no factual development in the administrative agency: Plum Creek was not entitled to an evidentiary hearing before the FPR Commissioner; the Commissioner did not offer an evidentiary hearing; and, most importantly, this is not a decision where agency expertise is central. The administrative record is

virtually nonexistent, consisting of the county forester's violation determination, the Commissioner's decision, and Plum Creek's filings in opposition to the termination decision. This is a pure adjudicatory case with little or no policy issues. The fundamental issue in this case is what the plan drafted by Plum Creek means—the agency was not interpreting and applying a statute, regulation, or even a policy. Plum Creek is essentially charged with breaching its permit application; in comparable situations, the agency does not get particular deference in that decision.

¶ 59. The majority has adopted a standard of extreme deference that makes the administrative decision controlling with no meaningful opportunity to contest it. Even if such deference were ever appropriate where the Legislature adopts de novo review, it is totally inappropriate in the case before us. As the trial court concluded, this level of deference allows the agency to create new rules as it goes along where the rules should be set in the controlling documents.

¶ 60. Finally, it is clear from the way that the majority has written its decision that it believes that the only right answer to the circumstances before the court is that provided by the State and that Plum Creek is relying on a technicality to avoid its just consequences. In fact, the evidence before the trial court showed many possible rationales, not built on technicalities, on which to resolve the conflict, and Plum Creek's explanation for what it did, as accepted by the trial court, was reasonable. The short answer to the majority's factual assertions is that the case was tried by a very experienced trial judge who made detailed and thorough findings of fact and conclusions based on them, which should be respected rather than rejected out of hand. I will address each of these points below.

### I. This Was a Pure Adjudicatory Proceeding Based on Whether or Not Plum Creek Complied with Requirements Contained in Two Documents, and the Evidence and Findings Show It Did Comply

¶ 61. To be eligible for the current-use or Use Value Appraisal (UVA) program, forestland must be "under active long-term forest management . . . in accordance with minimum

acceptable standards for forest management." 32 V.S.A. § 3752(9)(A). "Minimum acceptable standards for forest management" are defined, in turn, as "refer[ring] to certain standards established by the Commissioner of Forest, Parks and Recreation." Id. § 3752(13). Eligibility also generally requires compliance with "the regulations adopted by the [Current Use Advisory] Board." Id. § 3755(a); see id. § 3953 (establishing Current Use Advisory Board). Comprised of the Commissioner of Taxes, the FPR Commissioner, the Director of the Division of Property Valuations and Review (PVR), members of the private agricultural and forestry sectors, and local government representatives, id. § 3753(b), the Board has several legislatively defined duties: to periodically review the criteria for enrollment in the UVA program, recommend changes and improvements, and adopt rules to carry out its statutory goals. Id. § 3754(a), (c). The UVA Program Manual adopted by the Board sets forth minimum standards for forest-management plans, minimum standards for forest management and regeneration, standard forms for use by landowners enrolled in the program, and appendices containing additional guidance for foresters and landowners.

¶ 62. If any of the above statutes, rules, or policies were involved in this case, the FPR Commissioner would be entitled to substantial deference in interpreting them, a point discussed below. The Commissioner did not conclude, however, that Plum Creek violated any of those statutes, rules, or policies. Instead, the FPR Commissioner concluded that Plum Creek violated a timber-harvesting plan that Plum Creek itself drafted. No policy is involved in determining whether the plan was violated. I would accept that a decision to reject a plan would involve policy, and that decision would be based on agency expertise. But once the plan is accepted, the only relevant determination is whether the plan was violated.

¶ 63. Forestland is eligible for the UVA program if the landowner prepares and submits a ten-year forest-management plan and it is approved by FPR. Id. § 3755(b)(1)(C). In this case, Plum Creek had such a plan prepared by the company that owned the land before Plum Creek. The plan specified that when Plum Creek was to engage in timber harvesting, it was required by

25

the plan to seek and have approved a plan amendment for each "stand" in which the harvesting would occur. These amendments are known as prescriptions, and Plum Creek prepared one and had it approved for each of the three stands involved in this case. The prescriptions are prepared on forms supplied by FPR and are very short documents. I have attached the relevant content of these documents to this dissent in an appendix; the content takes up less than two pages. Thus, the decision to remove the land had to be based on a conclusion that Plum Creek's timber harvesting violated either the ten-year management plan or the relevant prescription; in this case it was based entirely on the prescriptions. These documents were drafted by the landowner, <u>not the agency</u>. See Vt. Dep't of Forests, Parks and Recreation, <u>Use Value of Forestland in Vermont</u> at 2 (Feb. 1, 2006) ("County foresters who are employed by the State do not write use value plans. Their role is to advise landowners and consulting foresters, review and approve management plans . . . and to conduct on-site monitoring."). They are essentially applications for a permit, and the controlling question is whether Plum Creek did what it said it would do in its application.

¶ 64. To a great degree the dispute has centered on cutting in Stand 34 and a rationale that pervades the decisions with respect to each of the stands—that the extent of cutting had to be even across the stand so the remaining forest after cutting would be the same throughout the stand. The Commissioner's decision focused on this stand and this rationale, and the majority decision has almost exclusively focused on it. The trial court found that the residual basal area (RBA) in the <u>cut</u> portion of Stand 34 was 28.5, only a small amount below the lower specification in the minimum prescription RBA of 30 to 40, and that the RBA for the whole stand was 47.4.[14] In his two-page adverse-inspection report, the county forester included three short sentences describing the violation in Stand 34:

> Stand has been cut contrary to prescribed silvaculture. Stand inventoried on 2/10/2010 and 2/12/2010. Residual basal area

---

[14] Basal Area (BA) "is a measure of forest density based on the square footage of trees per acre." <u>Jones</u>, 2004 VT 49, ¶ 10.

across 90.91 acres of the stand reduced to 19.7 square feet (36 inventory points with 2.63 standard error).

¶ 65.    The Commissioner gave three reasons why Plum Creek had violated its Forest Management Plan for this stand:

> [1] There was no indication that the cutting plan would have been modified had the sale reached completion.  In fact, Plum Creek's forester stated that the logger was not following their directions. The determination of "cut contrary" was based upon those acres cut to date, similar to any other violation that the state has pursued in the past.
>
> [2] Although the unit of measure for forest management purposes and UVA is the "stand," management can alter the unit enough to create different stands.  As a "stand" is a contiguous group of trees sufficiently uniform in age-class distribution, composition and structure, and growing on a site of sufficiently uniform quality, to be a distinguishable unit, the harvesting in stand 34 has created two separate stands as that area harvested has a very different age-class distribution, composition and structure now compared to that area left untreated.  They are no longer the same stand; therefore, they should be sampled and evaluated separately.
>
>  . . . .
>
> [3] The basis for the shelterwood method as a method of regeneration is that it creates a moderated microenvironment that promotes seed germination and seeding establishment as it elevates light levels near the ground and reduces the withdrawal of soil moisture.  To create this microenvironment, the application of the method involves leaving a residual overstory of large crowned, seed bearing trees that are uniformly distributed over the area of the new stand.  The notion that the goals and objectives of the shelterwood treatment were met by considering shade from trees over a kilometer away (in the uncut portion of the stand) as providing the necessary microenvironmental condition is a misapplication and a complete misunderstanding of the principle of the silviculture practice. The residual basal area of 19.7 square feet is considered a commercial clear cut. Additionally, the residual trees comprising this basal area are at best intermediate stems in the 10 to 12 inch diameter class that lack the crown size necessary to provide the shading conditions even if the desired residual basal area target was met.  Plum Creek's prescription should not be narrowly interpreted to just stocking levels.  Recommendations were presented relating to what would be removed (at-risk mature stems) and what would remain (sugar maples and yellow birch with large crowns, quality growing stock).

27

(Emphasis added.)  Except for the one reference to the plan in the third reason, the decision makes no reference to the content of Plum Creek's plan.  Thus, to determine whether Plum Creek violated the plan, the superior court and this Court have to independently examine the plan language in comparison to the rationale.

¶ 66.    The Plum Creek plan is contained in the appendix to this opinion.  The plan says Stand 34 has 137 acres.  There is no mention in the plan of an even distribution of trees.  Indeed, it says "[t]he understory varies greatly in stocking of acceptable regeneration."  It says that "the majority of the overstory is unacceptable growing stock."  It says "the shelterwood will be irregular in distribution."

¶ 67.    The first and second grounds for the decision to terminate Plum Creek from the current-use program are inconsistent and unsupported by any record evidence that the Commissioner had even at the time of rendering the decision.[15]  Under any standard of review, termination based on these rationales could not be sustained.

¶ 68.    The first rationale states that "[t]here was no indication that the cutting plan would have been modified had the sale reached completion."  In fact, the Plum Creek manager responsible for the tract sent a letter to the FPR county forester explaining that the timber harvesting contractor had violated Plum Creek's instruction in a number of respects and outlining how the harvesting would be done in the rest of the stand to stay within the prescription overall.  The letter was admitted into evidence as exhibit 27.  It is uncontroverted and directly contradicts the Commissioner's assertions.

¶ 69.    Even if the contrary evidence did not exist, it is important to state that there is nothing in Plum Creek's plan to suggest that the RBA measurement was to be made in the part of the stand that happened to have been "treated" when the county forester appeared for an observation visit.  Thus, there was no obligation for Plum Creek staff to give an "indication" they

---

[15]    As I discuss infra ¶¶ 91-93, we have no way of knowing what information the Commissioner actually had because there is no record of the inputs to the Commissioner's decision except for the county forester's determination.

would proceed differently in the remainder of the harvest as long as they met the RBA requirement at the end. Finally, it was irrelevant how FPR had pursued alleged violations in the past. If it wanted the timber harvesting to meet the minimum RBA requirements at all times during the harvest, it should have directed Plum Creek to put that standard in the plan.

¶ 70. The second rationale is even weaker. It is based on the premise that Plum Creek– "management" in the Commissioner's phrasing—had no intention of finishing its harvesting in the stand and was comparing the situation in the treated area with the situation in the untreated area. Thus, both the State and the majority have emphasized the Commissioner's language that Plum Creek asserted that "the goals and objectives of the shelterwood treatment were met by considering shade from trees over a kilometer away (in the uncut portion of the stand)." The statement is entirely disingenuous because the evidence was undisputed that Plum Creek intended that there would be no untreated area and there would be harvesting in all parts of the stand. Plum Creek never argued that a shade tree one kilometer away would make up for the lack of a shade tree in another area. The reality is that there never would be a comparison between treated and untreated parts of the stand if the State had not declared a violation before the harvest was completed and prevented harvesting in the remainder of the stands.

¶ 71. Although this rationale is poorly stated in the Commissioner's decision, it is argued by the State and accepted by the majority as a statement that the cutting that occurred on Stand 34 went beyond a RBA of 30 ft$^2$ and, therefore, could be grounds for termination of Plum Creek from the current-use program. The State's position is that whenever in the course of a timber harvesting FPR staff measure the RBA of the area in which harvesting has occurred the RBA cannot go below the minimum specified in the plan. Stated differently, the State's position is that all cutting must be even across the stand with no part more cut than another. FPR points to no language in the Plum Creek plan that actually states this requirement, and there is no such language. To the extent that the plan addresses the issue, it is directly contrary to the State's position. The plan says: "The shelterwood will be irregular in distribution." Uneven distribution

29

of shade trees was part of the plan and could be accomplished only by uneven cutting. There is no support for the State's position that uneven cutting within a stand violates Plum Creek's plan.

¶ 72. It is no answer to the absence of the requirement in the plan that FPR is simply enforcing its consistent policy. Whatever may have been FPR's policy, we are necessarily dealing here with legal requirements. FPR's policy is not stated in the plan or in legally adopted regulations. The most important function of judicial review is to prevent an agency from acting outside the legal system in which it operates.

¶ 73. The trial court concluded that this is exactly what occurred here. It found: "In this case, the State's evidence showed that it had relied heavily on RBA measurements . . . taken from plots in just a portion of each stand and rejected RBA evidence pertaining to the stands as a whole. In doing so, it imposed a standard that is not in the UVA manual, is not a norm in forestry practice, and was not included in the prescription." It added "Without any rule in the UVA manual or specification in the prescription, an owner would not be on notice that RBA would be measured other than by the stand as a whole, particularly where the particular prescription calls for a result of 30-40 'overall stand residual basal area.' "

¶ 74. The majority has added a new and different rationale for the Commissioner's decision—that Plum Creek is responsible for the measurement of only part of the stand, and must accept it, because it suspended the harvest and never restarted it. This rationale is not in the Commissioner's decision or in the superior court decision. It is legally and factually erroneous.

¶ 75. It is factually erroneous because Plum Creek could not proceed due to the fact that FPR withdrew approval of the harvest based on the April 26 adverse-inspection report of the county forester. In the period between the end of January, when the inspection occurred that led to the termination, and the date of the adverse-inspection report, Plum Creek could not proceed because it faced civil penalties and possible criminal liability as a result of the AMPs compliance issues until it resolved those issues to the satisfaction of FPR and ANR. These facts are set out in detail in ¶¶ 128-134 of this dissent.

30

¶ 76.    It is legally erroneous because nothing in the plan or the statute or regulations require that a harvest proceed continuously without interruption.  Not even FPR has argued that there is such a requirement.   The majority's position that Plum Creek violated such a requirement, and thus brought on RBA measurements of only part of the stand, has no support in the law.

¶ 77.    Unlike the first two rationales, the third rationale purports to address language in the plan.  It says "Plum Creek's prescription should not be narrowly interpreted to just stocking levels."   In fact, there are no stocking levels in the plan so the Commissioner's statement is curious at best.  Nor does the plan state that the RBA minimum must be met by trees that are greater than 12 inches in diameter.  Again, if FPR wants such a requirement it must insist that Plum Creek put it in the plan.  Like the first rationale of the Commissioner, this rationale was not testified to by the county forester who testified for FPR in the trial.

¶ 78.    The most important point about the Commissioner's rationale is that it is based on the Commissioner's determination that the RBA in the cut area of the stand was 19.7 ft$^2$.  In fact, as the superior court found, the RBA was 28.5 ft$^2$, a finding of fact that even the majority accepts, as I discuss later in this dissent.  The actual RBA is 50% above the RBA adopted by the Commissioner and close to the minimum RBA for the stand as a whole.  It is impossible to know what the Commissioner would have decided if she had to apply the right RBA in rendering her decision and could not rely on a conclusion that Plum Creek had actually performed a commercial clear cut.

¶ 79.    The majority has largely ignored the glaring holes in the Commissioner's decision because of its holding that deference controls everything.   Thus, for the majority, the Commissioner's decision is right because it is not "standardless, unsupported by the evidence, or contrary to law," the standard of review it finds applicable.  Ante, ¶ 35.  I will address later my differences on standard of review, but the point here is different—that deference has no application where the only question is whether Plum Creek complied with its plan and the

Commissioner has made fundamental errors in her analysis. While the majority addresses a part of the Commissioner's decision, it never explains how Plum Creek violated any provision of its plan. The majority decision relies on the Commissioner's decision because it "promotes the overall policy of the UVA program," "is logical," "allows for more effective oversight by FPR," and "it is a method consistently used." Ante, ¶¶ 36-39. As the above discussion states, I disagree with many of these reasons, but that is entirely beside the point. Nowhere does the majority say that the forester's opinion is required by the plan, the central question that was before the superior court and before us. All of the majority's points are reasons why FPR might have acted to insert the forester's opinion into the plan that Plum Creek submitted, but they are irrelevant to this case because FPR accepted the plan without this language, and the superior court found that the opinion was not contained in or supported by the plan. That is all that should count in this decision.

¶ 80. The majority's decision in this case is entirely different from that in Jones, 2004 VT 49, ¶ 10, the decision on which the majority most relies. In Jones, this Court quotes exactly the plan provisions it found were violated and why there was a violation. There were two such provisions. One provided that there would be "selection cuts approximately 40 feet in diameter." Id. ¶ 5. The evidence showed "a series of clear cuts in Stand 3 well in excess of the 'approximately 40 feet in diameter' prescribed in the plan. Evidence of the extensive cuts— ranging in size from one to two acres—was uncontroverted." Id. ¶ 8. The second part of the plan that was violated allowed " 'limited single tree and group selection cuts' of overstocked areas of hardwoods." Id. ¶ 10. The evidence showed that the cutting in a part of the stand that the landowner identified was "overstocked" and went well beyond the limited single-tree and group-selection cuts specified in the plan. Id. ¶ 14. The difference between the analysis in Jones and the analysis here is glaring.

¶ 81. There are three other points about Jones that are important for comparison in this case. First, Jones involved a completed harvest that the forester inspected during a regular five-

32

year inspection.  Id. ¶ 5.  It did not involve the interruption of a partially completed harvest with comparisons between harvested and unharvested areas.  Second, to the extent that the forester acted based on part of a stand, it was because the prescription authorized cutting only in "overstocked areas" and the landowner had designated the 15.8-acre area involved as overstocked.  Id. ¶ 13.  There is no such designation in this case.  The latter point is important because the majority asserts that Plum Creek should have known after Jones that its compliance could be judged based on cutting in only part of a stand.  Even assuming that Jones gave a different landowner of different land with a different plan proper notice of an unwritten FPR policy, Plum Creek would learn from Jones only that if the landowner specifically designated a part of a stand for a specific different treatment, and violated the requirements of the designation, it could be terminated from the current-use program.  The third point is that the trial court was reversed in Jones because its findings and conclusions were "clearly erroneous."  Id. ¶ 7.  The majority found no findings or conclusions clearly erroneous in this case.

¶ 82.    Finally, it is important to reemphasize that the failure to find an inconsistency with the plan is not fixed by the choice of standard of review.[16]  Under any standard of review,

---

[16]  I do not think the standard of review is determinative here for the reason stated in the text.  If it were relevant, I would apply the standard of review for determinations of whether a permittee has complied with conditions of a permit.  In Agency of Natural Resources v. Weston, we held:

> In construing permit conditions, we rely upon normal rules of statutory construction.  Our principal concern is to implement the intent of the draftpersons.  Ordinarily, we do so by accepting the plain meaning of the words because we presume that they express the underlying intent.  We also keep in mind, however, that because land-use regulations are in derogation of property rights, any uncertainty in their meaning must be decided in favor of the property owner.  We must be particularly careful that the conduct complained of falls within the clear prohibition of a permit condition before requiring the landowner to pay a large monetary penalty.  Finally, we must accord deference to the environmental court's construction of a permit condition, particularly when the court's expertise will assure consistent interpretations of the law.

33

the superior court found that FPR's decision is based on a requirement that is not in the Plum Creek plan, and the majority has not, and cannot, respond to this conclusion that is determinative of the proper outcome of this case.

## II. Standard of Review is De Novo

¶ 83.    Having covered the first reason why the majority decision is wrong, I turn to the second—that the majority has used a standard of review inconsistent with the governing statute.

¶ 84.    I started this dissent with the meaning of de novo review.  While the majority admits that de novo review applies, it is helpful to explain why de novo review is the governing standard.  The short answer is because that is what the governing statute says: "An appeal of this decision of the Commissioner may be taken to the Superior Court in the same manner and under the same procedures as an appeal from a decision of a Board of Civil Authority as set forth in chapter 131, subchapter 2 of this title."  32 V.S.A. § 3758(d).  The cross-reference is to the subchapter on property tax valuation appeals to the superior court or to the PVR Director.  We explained the effect of this cross-reference in Mollica v. Division of Property Valuation & Review, 2008 VT 60, 184 Vt. 83, 955 A.2d 1171, in the context of an appeal from PVR. Although Mollica was controlled by § 3758(a), rather than § 3758(d), the language governing the appeal was identical in those subsections.[17]  Thus, we recognize Mollica as a binding precedent of the interpretation of both subsections.  As Mollica holds, the effect of the cross-reference is

2003 VT 58, ¶ 16, 175 Vt. 573, 830 A.2d 92 (mem.) (quotations omitted); accord In re Barry, 2011 VT 7, ¶ 19, 189 Vt. 183, 16 A.3d 613.  The lessons of these cases are that permit conditions are construed under normal rules of statutory construction and are construed to implement the intent of the draftsperson, who in this case was Plum Creek.  The deference we give is to the trial court, not the administrative agency.  Finally, a prohibition must be clear if, as is the case here, it will be the grounds for a large monetary penalty.

[17]   Mollica was decided under 32 V.S.A. § 3758(a) because it involved an appeal from the PVR Director, not an appeal from the FPR Commissioner.  At the time of the decision, the judicial review statute for such an appeal was identical to § 3758(d), the statute involved here.  In 2013, § 3758(a) was amended to delete the cross-reference to the procedure in Chapter 131, Subchapter 2 of Title 32 and substitute "from there to Superior Court in the county in which the property is located."  2013, No. 73, § 13.  Section 3758(d) was not similarly amended.  Because the amendment in § 3758(a) came after Mollica was decided, that decision is still controlling precedent on the meaning of § 3758(d).

34

that appeals to superior court from a decision of the FPR Commissioner is de novo. Mollica, 2008 VT 60, ¶ 8; see 32 V.S.A. § 4467 (stating that superior court on appeal "shall proceed de novo and determine the correct valuation of the property as promptly as possible").

¶ 85. I recognize that it is possible that review can be de novo and on the record generated in the administrative agency at the same time. The appeal process under 32 V.S.A. § 4467 is not on-the-record review. As explained in Shaffer v. Town of Waitsfield, 2008 VT 44, 183 Vt. 428, 956 A.2d 520:

> The proceeding before the appraiser was a de novo hearing, 32 V.S.A. § 4467, which we have consistently held requires the appraiser to try the dispute anew, as though it had never been heard before. This means that the Town was not limited to proffering—and the appraiser was not limited to considering—only such evidence as was presented below, and that the appeal presented taxpayers with the risk of increase as well as the chance of decrease.

Id. ¶ 10 (quotation omitted).

¶ 86. Mollica recognized this. 2008 VT 60, ¶ 8. The trial court here proceeded exactly as specified in Shaffer. Although the majority has reversed the court, there is no suggestion that it proceeded improperly.

¶ 87. Property valuation appeals regularly become battles of expert witnesses, with the municipality's expert witness having no special status greater than the expert witness supplied by the taxpayer, and the court or hearing officer ultimately resolving the matter. A good example of the process is contained in our recent decision on property valuation, Vermont Transco LLC v. Town of Vernon, which involved a utility transmission property valued by the Town at $92 million. 2014 VT 93A, 197 Vt. 585, 109 A.3d 423. The decision turned on whether the Town used the proper methodology for valuing this unique property. The evidence came largely from two expert witnesses who presented different valuation methodologies.

¶ 88. I believe we should apply de novo review in this case even if the Legislature had not directed it. Although we have applied a strong presumption against the availability of de

35

novo review of the decision of an administrative agency, we have generally relied on the analysis of the federal courts under the Federal Administrative Procedures Act (APA). See State Dep't of Taxes v. Tri-State Laundries, 138 Vt. 292, 293, 415 A.2d 216, 218 (1980). The Federal APA provides a number of options from which reviewing courts choose the proper standard of review of administrative action. 5 U.S.C. § 706(2). Among the grounds for reversal is that the administrative decision is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." Id. § 706(2)(F).

¶ 89. De novo review under 5 U.S.C. § 706(2)(F) plays a very limited role in judicial review of administrative proceedings. In Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971), abrogated by Califano v. Sanders, 430 U.S. 99 (1977), the U.S. Supreme Court ruled that § 706(2)(F) is applicable in only two instances, one of which would govern this case: "Such de novo review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate." Id. This case is an adjudicatory proceeding specifically authorized by statute. The agency "factfinding procedures" are inadequate; in fact, they are nonexistent. If § 706(2)(F) were applicable here, it would require de novo review.

¶ 90. My conclusion that the factfinding procedures are inadequate requires explanation. The vast majority of administrative decisions are reviewable within the agency under the extensive procedures contained in the Vermont Administrative Procedure Act (Vermont APA), 3 V.S.A. § 800 et seq. For proceedings subject to it, the Vermont APA requires a hearing at which a party can present evidence, id. § 809(c), and cross-examine witnesses, § 810(3), and on which the decisionmaker renders findings of fact based on the evidence, id. § 812(a). These requirements, however, are applicable only in a "contested case," defined as a proceeding "in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing." Id. § 801(2); see also id. §§ 809(a), 810, 812(a).

¶ 91. The administrative review statute applicable in this case provides that an "owner who is aggrieved by . . . the filing of an adverse inspection report . . . may appeal to the Commissioner" within sixty days of the filing of the report. 32 V.S.A. § 3758(d). There is no requirement of a hearing before the Commissioner. Although there was a face-to-face meeting between the Commissioner and representatives of Plum Creek, no evidence was taken, and there is no transcript of what transpired. There are no findings of fact. The decision of the Commissioner is apparently based primarily on the decision of the FPR county forester, even though there is no indication the forester was present at the meeting. The record as transmitted by the Commissioner to the superior court pursuant to Vermont Rule of Civil Procedure 74 consists of the decision, the letters and documents filed by Plum Creek, and the written decision of the county forester.

¶ 92. The point is that there are no factfinding procedures applicable in this case. The majority states that:

> The Commissioner examined the evidence supplied by the county forester and concluded that both the evidence and the methodology were sound. The Commissioner found that the data was collected appropriately and compliance was measured according to the correct methodology.

Ante, ¶ 13. While it would have improved the Commissioner's decision if she had done and said what the majority attributes to her, her decision does not contain what the majority claims. The Commissioner's decision does say, "The violation is clear and undisputed by information provided by Plum Creek." Even the short description of the process before the Commissioner included in the majority decision shows the latter part of this statement is erroneous.

¶ 93. There is an obvious reason why the majority's statement is unsupported by the record—there is almost no record. As I described above, the record consists of the violation decision of the county forester, the filings of Plum Creek, and the decision of the Commissioner. The Commissioner's decision contains findings and conclusions that are not in the forester's letter or the filings of Plum Creek. The record does not include any information on which the

37

forester relied, any information on the action of middle-management of FPR between the forester and the Commissioner,[18] or the source of many findings and conclusions of the Commissioner. The situation here is essentially identical to that in <u>Conservation Law Foundation v. Burke</u>, 162 Vt. 115, 645 A.2d 495 (1993):

> In order for judicial review to proceed on the record, it is critical that the court have before it the full agency record that was before the Secretary at the time he made his decision. . . . Thus, if the agency decisionmaker's decision is based on the work and recommendations of subordinates, the record should include all documents considered by the agency employees whose input reached the decisionmaker.

<u>Id</u>. at 127, 645 A.2d at 502 (quotations omitted).

¶ 94.   <u>Burke</u> was not a de novo review proceeding.  <u>Id</u>. at 126, 645 A.2d at 502.  The record in that case was as incomplete as that in this case.  We held in that case that the superior court must remand the case to the agency to obtain a proper record before proceeding.  <u>Id</u>. 127-28, 645 A.2d at 503.  Here, the inadequacy of the supplied record supports the de novo evidentiary hearing held by the trial court to establish a record.

¶ 95.   I recognize that <u>Burke</u> held that de novo review was not available even in a case where there is no administrative factfinding and no record on which effective judicial review could have gone forward.  As in <u>Burke</u>, the reviewing court in this case could have required the production of a complete record of the administrative action, the proper remedy if de novo review were not statutorily required.  In my view, the difference lies in the nature of the administrative decision.  In <u>Burke</u>, the decision involved the evaluation of the public health and safety effects of emission of toxic substances from a solid waste incinerator as part of a complex regulatory process.  In that circumstance, agency expertise was critical and the need for

---

[18]   The county forester's adverse-inspection report was sent to the Chief of Forest Management, and thereafter to Plum Creek.  By letter of May 20, 2010, the Director of Forests of FPR notified Plum Creek that the investigation was complete and "was forwarded to the Waterbury Office for review" and sent to PVR, "recommending that the property be removed from UVA for harvesting contrary to the management plan."  Even this letter was not part of the record.  The record did not include any information about the review in the Waterbury Office or any other action between the county forester's report and the Commissioner's decision.

deference to the agency decision was high. This case, by comparison, essentially comes down to counting trees where agency expertise is relatively unimportant. I will explain the need for expertise in this case below. I emphasize that the above discussion is about how judicial review should have proceeded <u>had there been no legislative requirement of judicial review</u>. In this case, the Legislature has required de novo review, and we are required to follow that direction.

¶ 96.  Finally, on this point, it is important to recognize that the Commissioner could have chosen to hold an evidentiary hearing but did not. An evidentiary hearing would have prevented, at least in part, the difference between the information on which the Commissioner rendered her decision and the testimony and evidence on which the superior court rendered its decision. In fact, under the non-process employed, there were no self-imposed restrictions on how the Commissioner chose to find the relevant facts, and her decisionmaking process is opaque apart from her reliance on the FPR forester.

### III.  The Majority's Standard of Review is Wrong and Inconsistent with the Legislature's Direction

¶ 97.  In <u>Town of Victory v. State</u>, 2004 VT 110, ¶¶ 14-24, we were required to determine the standard of judicial review of a decision of a state agency in valuing state-owned real property in a town under the state PILOT (payment in lieu of taxes) program. Unlike in this case, the Legislature had provided the right of appeal of a PILOT determination but did not specify the standard of review. We posited three possible choices: de novo review; review under chapter 131 of subchapter 2 of title 32, specifically 32 V.S.A. § 4467; or traditional deferential on-the-record judicial review. We essentially found that choices one and two were the same, using the analysis discussed above. <u>Id</u>. ¶¶ 14-21. We defined the third possibility as follows: "The third possibility is that the Legislature intended the superior court to treat § 3708 appeals just as it treats appeals from other administrative actions—that is, it should review the record and overturn the agency's determination only if it finds it arbitrary and capricious." <u>Id</u>. ¶ 22. In the absence of a legislative directive to the contrary, we chose the third possibility.

39

¶ 98.    Although there are slight differences in the language, the majority has chosen the third possibility in this case.  The decisions which it states have the proper standard of review, In re Johnson, 145 Vt. 318, 488 A.2d 750 (1985), and In re DeCato Bros., Inc., 149 Vt. 493, 546 A.2d 1354 (1988), are unremarkable examples of "arbitrary and capricious" review based on the administrative record, exactly the standard of review we would have chosen under Town of Victory in the absence of legislative direction to the contrary.  In each of these cases there was an evidentiary hearing at the administrative level and findings of fact and conclusions of law.  In Johnston, the appeal came directly to the Supreme Court so there could be no independent fact-finding.  In DeCato, the judicial appeal went first to the superior court but again it was on the administrative record and the evidence in the administrative hearing.  Thus, judicial review in each case proceeded under the Vermont APA, and the standard of review was that routinely applied in APA review.

¶ 99.    The problem with deriving the standard of review from these cases is obvious.  In this case, the Legislature has specified a standard of review, and it is not the third possibility specified in Town of Victory, highly deferential on-the-record review.  Instead, it is a form of de novo review used in property tax appeals.  The majority has turned the statutory standard of review into its polar opposite.  How it has done so is a fascinating process that reminds me of the child's game of broken telephone where "a child whispers a phrase into the ear of a second child, who whispers it into the ear of a third child, and so on.  Distortions accumulate, and when the last child announces the phrase, it is comically different from the original."  S. Pinker, Words and Rules: The Ingredients of Language 47 (1999).

¶ 100.  The starting point in the majority analysis is two sentences from Jones, 2004 VT 49.  Jones was a case similar to this one, but the statutory standard of review statute is not reflected anywhere in the decision; apparently neither party recognized its substance and application. The two sentences are: "We discern no basis to conclude that the Department's finding of a violation in this case was standardless, unsupported by the evidence, or contrary to

40

law. Accordingly, we conclude that the court's findings were clearly erroneous and must be reversed." Id. ¶ 14. The majority finds the first sentence to contain the applicable standard of review.

¶ 101. Even if we assume that the Court was aware of the statutory standard of review, I would not find that the language in Jones on which the majority relies was intended as a statement of the standard of review for that and following cases. The first sentence is not followed by a citation to any authority, and the words do not appear in any earlier case, or in any statute, as a standard of review. Certainly, if we were announcing some wholly new standard of review for current-use decisions by FPR, we would explain why we were doing that and how we had the power to do so. In fact, the words have never been cited since as a standard of review, and the development of the correct standard of review occurs in Mollica, a later decision, without relying upon the Jones language. Moreover, as the second sentence explains, the actual standard of review that decides the Jones case is different—that findings of fact cannot stand if so lacking in support in the evidence that they are clearly erroneous—is familiar and totally consistent with de novo review.

¶ 102. Even if we intended some new and different standard of review, the majority has turned it into something more than it says. It does not say the agency will prevail if its decision is based on a standard, is consistent with the evidence, and is consistent with law. At best, it says instead that the agency decision will prevail if those things are true and the decision against it is based on a clearly erroneous finding of fact. This is a very important point because in this case, unlike Jones, the majority finds no instance where the trial court made a clearly erroneous finding of fact.

¶ 103. I would distinguish the Jones language based on the discussion in the two paragraphs above, but I believe that the likely explanation for its presence in the opinion is that the Court, including I, was unaware of the statutory standard of review. The Jones language is fundamentally at odds with de novo review as required by the statute because under de novo

41

review the court is expected to substitute its judgment for that of the agency when it thinks the agency is wrong. The language has no place in a decision made under a de novo standard of review. If the majority believes it does, it should explain how.

¶ 104. The next step in the majority's analysis is to rely on In re ANR Permits in Lowell Mountain Wind Project, 2014 VT 50, ¶¶ 15-16, 196 Vt. 467, 98 A.3d 16, for the proposition that "decisions made within the expertise of such agencies are presumed correct, valid and reasonable." As the majority states, ANR Permits is a de novo review case, but the quote is taken out of context and, as a result, the meaning is changed. The relevant paragraph of ANR Permits states:

> In commencing our own review, we must first determine the standard of review that applies in appeals from the PSB sitting in its appellate capacity. As all parties noted, we generally give substantial deference to an agency's interpretation of its own regulations—in this case, ANR's interpretation of the VSMM. Absent a clear and convincing showing to the contrary, decisions made within the expertise of such agencies are presumed correct, valid and reasonable. Interpretation of the VSMM is squarely within ANR's expertise as its authoring agency. This deferential standard remains on appeal, even after the PSB holds a de novo hearing on the matter.

Id. ¶ 15 (footnote omitted) (quotation omitted).

¶ 105. The paragraph is solely about the deference accorded an agency in interpreting its own regulations, deference that is entirely consistent with de novo review. See Letourneau v. A.N. Deringer/Wausau Ins. Co., 2008 VT 106, ¶ 8, 184 Vt. 422, 966 A.2d 133. Thus, it was appropriate to cite and rely upon Johnston, which is not a de novo review case. To show the limit of the deference ruling, the Court added: "In keeping with the statutory standard of review, [the PSB] gave no deference to ANR's permit decision." ANR Permits, 2014 VT 50, ¶ 11. Thus, the decision does not give general deference to the factfinding, methodology, or conclusions of an agency, the deference involved in this case. This case does not involve the interpretation of regulations by the agency that adopted them.

42

¶ 106. The majority cites another part of the ANR Permits decision that it finds supports its deferential standard of review. The decision in that case involved the validity of the stormwater discharge permit for a mountain top wind electric generation project. The agency allowed the project to employ an alternative stormwater treatment practice that opponents argued was not authorized by governing regulations. As noted above, the decision turned entirely on whether the design was consistent with the regulations as interpreted by ANR and the Public Service Board (PSB). In reaching our decision that ANR and the PSB properly interpreted the regulations we noted that the Legislature explicitly gave statutory discretion to ANR in determining whether to issue a stormwater discharge permit and that the PSB had to respect that discretion even within the context of de novo review. Id. ¶ 16.

¶ 107. The ANR Permits analysis cannot change the standard of review in this case. In the context of renewable energy projects, a large number of types of ANR permits are reviewable de novo by the PSB under 10 V.S.A. § 8506. Some of these give specific discretion to ANR in deciding whether to issue a permit; others do not. See 10 V.S.A. § 8503(a). Despite the presence of de novo review, the PSB is required to apply the "substantive standards" applicable to ANR, including any discretion ANR has in determining whether to issue a permit. Id. § 8506(d); ANR Permits, 2014 VT 50, ¶ 16. This is the context of ANR Permits.

¶ 108. Here the standard of review is imposed by statute, 32 V.S.A. § 3758(d), for only two administrative actions by FPR: filing an adverse-inspection report that results in termination from the current-use program or refusal to approve a forest-management plan. Under the majority's standard-of-review theory, because either of these actions lie in the discretion of FPR, the statutory standard of review is cancelled and replaced by deferential review. To state the theory is to expose how illogical it is. ANR Permits does not create a way for a court to refuse to

apply the standard of review specified by the Legislature.[19]  FPR is entitled to no deference under ANR Permits.

¶ 109.  Finally, the majority pivots to a case involving an APA contested case appeal, after an agency hearing, where the standard of review is explicitly deferential and not de novo, In re Williston Inn Grp., 2008 VT 47, ¶ 13, 183 Vt. 621, 949 A.2d 1073 (mem.), demonstrating it has reached the point where there is no difference between a de novo standard and a deferential, on-the-record standard.

¶ 110.  The ultimate test of the holding on standard of review has to be whether we have complied with the governing judicial review statute.  Whatever the logical twists and turns in analyzing the standard of review, and even if each step of the way appears to be consistent with and controlled by precedent, the result must be consistent with the statute.  In the terms of "broken telephone," the result of the majority's analysis is "comically different" from the statutory standard.  The majority has turned the statutory standard of review into its polar opposite and found against Plum Creek as a matter of law on the polar opposite standard of review.

### IV.  The Decision Does Not Involve Policy

¶ 111.  The majority decision states and reiterates the need to protect and rely on agency expertise in numerous places in support of its deferential standard of review.  In citing and discussing ANR Permits, it describes the agency decisions here as "complicated methodologies within an agency's expertise."  Ante, ¶ 30, citing ANR Permits, 2014 VT 50, ¶ 16.  There are three issues on which methodology was disputed: (1) whether even cutting was required so that the area cut never fell below the minimum; (2) the actual RBA in the cut area; and (3) when tree

---

[19]  Even if there might be a case for discretion with respect to plan approval, there is none for filing an adverse-inspection report.  FPR is required to file an adverse-inspection report if it "finds that the management of the tract is contrary to the . . . forest management plan."  32 V.S.A. § 3755(c).

regeneration measurements should be taken to determine whether the goals of the harvest were achieved.

¶ 112.  Whether even cutting was a proper requirement was the subject of expert dispute, and under the statutory standard of review, the superior court could substitute its judgment for that of the Commissioner as I explain above.  The superior court believed the expert witness for Plum Creek and not the FPR expert witness, the county forester, and should be affirmed on that basis.

¶ 113.  My main view on even cutting, however, is different.  If even cutting was a plan requirement, it had to be explicitly stated in the plan.  The wording of the plan is actually contrary to a requirement of even cutting—it indicates that the shelterwood is irregularly distributed and the "overall stand" RBA must be 30 to 40 ft$^2$.  FPR's expertise may be appropriate to determine whether even cutting should be required, but if it decides even cutting is required it must put it in the plan or a separate regulation.  In this case, it did not, and Plum Creek cannot be terminated based on the nonexistent requirement.

¶ 114.  The second point of dispute is actually relied upon in the Commissioner's decision.  The decision states that the RBA for the cut area in Stand 34 was 19.7 ft$^2$, just above 60% of the required minimum RBA.  The superior court found the RBA of the cut area was actually 28.5 ft$^2$, only 5% below the required minimum RBA.  Again, the superior court's conclusion was based on the testimony of Plum Creek's expert witness who testified that he measured more trees than the county forester so that the extent he had to extrapolate to reach the estimated RBA was less.  The court found:

> Apart from whether RBA is measured across a stand as a whole, the Court finds that Mr. Holleran's methodology for measuring RBA produced a more reliable result, as it was based on measurements taken from a significantly greater number of sample plots.  His additional explanation of the difference between his figures and Mr. Langlais's is credible: that it was likely attributable in part to Mr. Langlais not counting all the trees in the sample plots, thereby producing a lower RBA measurement.  While Mr. Langlais testified generally that his measurements were taken in a

manner consistent with the UVA manual, the Court finds the quality and reliability of Mr. Holleran's measurements to be superior.

The majority states that the trial court could make this factual determination, apparently because, despite the disagreement with the county forester's methodology, and the Commissioner's finding based on that methodology, the disagreement is over the relatively simple matter of counting trees. Ante, ¶ 23 n.7.

¶ 115. The majority answers, however, that the RBA calculation difference is irrelevant because it came out under a 30 $ft^2$ RBA, no matter how slightly. Even under the majority's rationale I find that explanation insufficient. The Commissioner's decision relied upon the fact that the RBA was 19.7 $ft^2$, which would indicate there had been a commercial clear cut. In fact, the RBA was very close to the minimum. The Commissioner was concerned about whether a part of the stand would have "a very different age-class distribution, composition and structure" from the rest of the stand. In fact, if the harvest were completed within the RBA minimum, as intended, it is not clear there would be a "very different" remaining growth anywhere in the stand. The problem, of course, is that the FPR policy that it is implementing is written down nowhere so it is impossible to know what it actually is, a large deficiency when FPR claims it can come in at any time during the harvest of an irregular shelterwood to measure compliance. At a minimum, the Commissioner should be required to explain why an RBA of 28.5 $ft^2$ is inadequate in these circumstances.

¶ 116. The third issue in dispute was joined particularly with respect to Stand 43, a different stand from that considered by the majority, but I will consider it here because it is mentioned in the Commissioner's decision with respect to Stand 34. As I excerpted above, the Commissioner's decision states: "the residual trees comprising this basal area are at best intermediate stems in the 10 to 12 inch diameter class that lack the crown size necessary to provide the shading conditions even if the desired residual basal area target was met. Plum Creek's prescription should not be narrowly interpreted to just stocking levels." Putting aside

46

whether a landowner can be terminated from the UVA program based on noncompliance with a "broad" interpretation of the plan based a plan requirement that is not actually in it, the facts as found by the superior court are contrary to the Commissioner's apparent conclusion.

¶ 117. The county forester criticized the harvest because it did not produce the promised regeneration of new trees—he found "there was regeneration in only 15% of the plots examined." This opinion was based on a standard of regeneration of 350 stems per acre immediately after the harvest. Plum Creek's expert witness, by comparison, did a regeneration study three growing seasons after the harvest, also against a standard of 350 stems per acre. He found a regeneration rate of 12,000 seedlings per acre, far exceeding the minimum requirement. The superior court accepted the conclusion of Plum Creek's expert witness because the UVA manual standard is measured three years after the regeneration harvest and the witness's measurements were more reliable.

¶ 118. Although the majority has not responded to the superior court's analysis and conclusion, it essentially involved the same level of competency as the counting of trees to measure the RBA. It was also the counting of trees, in this case small ones, to measure regeneration. The main difference between the superior court's conclusion and that of the Commissioner involved when the measurements were taken; the superior court's measurement time was in compliance with the governing UVA manual; the Commissioner's conclusion was not.

¶ 119. Again, the superior court conclusion does not involve policy for the same reason that the resolution of the RBA issue does not involve policy. While it does not address a requirement that is stated in the plan, the conclusion of the superior court is nevertheless important for an understanding of the Commissioner's decision. Reduced to its main point, the decision here is about regeneration of a healthy and productive forest. The Commissioner concluded that the cutting level was too great to allow regeneration. Plum Creek proved that

regeneration, orders of magnitude above what was required, were occurring and thus the harvest cutting rate was a success. The superior court agreed with Plum Creek.

¶ 120. Because of the regeneration result, this dispute is largely about a technicality. That is my last point in the following section.

## V. The Facts Support Plum Creek's Position

¶ 121. There are some important facts not contained in the majority's recitation that bear on whether Plum Creek's position was reasonable and the trial court acted within its discretion in accepting it. One group is laid out in the opening two paragraphs of this dissent, and I will return to these facts below. Another group relates to the present condition of the forest over which this controversy arises and the goals of the logging activities that FPR approved.

¶ 122. The overall forest in this case was in poor condition to support commercial forestry. The prescription for each of the stands in controversy states that the stand "has high residual stand damage" and the beech trees are diseased. See Appendix. The trial court described the situation and the goals of the timber harvest as follows:

> [T]he general goals were to cut in a manner to change a poor quality old forest into a new forest through the creation of new growth. This would be accomplished by harvesting damaged trees and large trees that would inhibit the growth of desirable young trees, promoting the growth of desirable young trees, retaining trees that could provide seeds and shade for new growth in a desirable growth pattern, establishing even age management on the stands with both existing young trees and new growth, and optimizing conditions for growth for the future.

If this had been a forest in which 100% of the trees were valuable and desirable for sale and the goal was to maximize return on these trees, the requirement that logging occur evenly over a stand would be reasonable and understandable such that excessive harvesting in one part of the stand would be a clear indication that excessive harvesting overall was intended.

¶ 123. The situation in this case was very different. Thus, the prescription for Stand 34, the stand in which this conflict primarily developed, stated: "The shelterwood will be irregular

48

in distribution and will target Sugar Maple and Yellow Birch with large crowns to provide shade and seed distribution." It added, "the portions of the stand will also receive 1-2 acre patches where quality and stocking are not sufficient for shelterwood." See Appendix. Given the "irregular distribution" of logging activity, the presence of an arbitrary area in the stand with a lower RBA than contemplated overall was entirely expectable. Put another way, even cutting was highly unlikely because the tress that needed to be cut were not evenly distributed over the stand. The cutting could not occur pursuant to some artificial standard of equal harvesting per acre.

¶ 124. Finally, it is important to understand that the measure of success for Plum Creek was whether regeneration occurred as a result of the harvesting, the exact goal that the Commissioner stated she was enforcing. The evaluation of the partial harvest three years later shows that it was an overwhelming success—the regeneration levels are orders of magnitude in excess of what was required. Thus, Plum Creek is being heavily penalized for a success.

¶ 125. This, and the facts in the opening paragraphs, brings me to the heart of my disagreement with the majority's characterization of the facts and Plum Creek's perspective on the facts. This conflict would likely never have arisen in the courts if the timber harvesting was completed in the three stands, and that completion was only days away when the site visit occurred. Plum Creek never intended to harvest only part of the stand and certainly not only the part of the stand that had been logged to that point. The fact that only part of the stands were harvested, and harvest measurements are available only on a part of the stands, was a direct result of the FPR forester's conclusion based on the site visit that the stands were being "cut contrary." While there is no indication that the FPR forester could or did order the logging stopped, Plum Creek was put in a position of stopping logging operations to protect itself from a FPR decision to terminate it from the UVA program.[20]

---

[20] Its decision was also based in part on the AMPs violations, and Plum Creek's decision not to move forward until these were corrected. They were, however, corrected.

¶ 126. The majority has fixed on its view that it makes no sense to average between the logged area of a stand and the unlogged area, relying particularly on the Commissioner's statement that considering a tree a kilometer away in the uncut portion to determine compliance for a tree in the cut portion was a "misapplication and a complete misunderstanding of the principal of the silviculture practice." Everyone agrees with the Commissioner's statement, including Plum Creek's expert, but it does not answer the basic problem with the State's position. Plum Creek never intended to harvest only part of a stand and did not claim so here. This is an example of attributing a position to a party to tear it down—a strawman position. The Plum Creek position has always been that the harvest could not be judged in midstream and should have continued to its end, and then it could be judged on whether it violated the plan. The cause of this controversy is the stopping of the timber harvest days away from its completion and the required determination of whether the plan was violated by a timber harvest that was never completed. Plum Creek's expert testified that Plum Creek could complete the harvest fully compliant with the provisions of the plans, particularly the minimum basal area requirements and the use of appropriate treatments in each part of the stands. He noted particularly about Stand 34 that the area that had been logged had been extensively damaged by the 1998 ice storm.

¶ 127. By footnotes 8, 9 and 10 the majority has added to its position that it was fair to consider only part of the stands by stating that if Plum Creek intended that the RBA be judged on the stands as a whole, it should not have shut down the harvest at the time of the initial inspection on January 26, 2010 and should have completed it at some time thereafter. The majority asserts that stopping the harvesting was wholly a decision of Plum Creek and not a decision of FPR. Even the limited facts in the record show that this position is wrong.

¶ 128. There were two adverse consequences of the January 26, 2010 site visit during the harvesting. First, as discussed above, the FPR county forester decided that Plum Creek had "cut contrary" to its plan. Second, the county forester decided that Plum Creek had violated the AMPs in a number of respects. Later that day, the Plum Creek forester sent the FPR county

50

forester an email expressing an intent to comply with program requirements and thanking the forester for cooperation in meeting those standards. The next day, the Plum Creek forester sent the county forester a formal letter describing the situation observed on January 26 and specifying steps Plum Creek would take in the future to comply with the requirements that bound it. It specifically described the steps it would take to correct the AMPs violations alleged by the forester and prevent AMPs violations in the future.

¶ 129. It is important to understand that the consequences for an AMPs violation and a violation of the harvest plan are different. Both can result in termination from the UVA program, but AMPs violations that result in unpermitted discharges of waste into the waters of the state in violation of 10 V.S.A. § 1263(a) can result in civil penalties up to $10,000 per day for each day of violation. See 10 V.S.A. § 1274(a)(6). Such a discharge is also a crime that can result in imprisonment for up to six months. Id. § 1275(a). The FPR county forester found that the AMPs violations were "discharge resulting" such that the civil penalties and possible criminal liability were applicable. When charged with an AMPs violation, Plum Creek was forced to suspend the harvest in order to correct any AMPs violations.

¶ 130. The county forester never responded to the communications from the Plum Creek Forester, but another site visit on AMPs compliance was planned with ANR staff responsible for AMPs enforcement. That occurred on February 9 but did not resolve the issues because snow had fallen on the site making it impossible to observe the alleged violations. In a February 18 letter, FPR outlined the steps needed for Plum Creek to come into compliance with the AMPs. Plum Creek hired a contractor to do the remedial work, and the ANR and FPR staff revisited the site on April 19, 2010. On April 27, FPR sent a letter to Plum Creek saying that Plum Creek was now in compliance with the AMPs. Plum Creek could not have moved forward with the harvest until all the AMPs issues were corrected; that is, when it received the April 27 letter.

¶ 131. Meanwhile the parties had a meeting with respect to compliance with the plan on February 18. The Plum Creek representatives hoped to learn at that meeting that there would be

no further actions that would prevent it from moving forward with the harvest. Instead, they learned that the county forester was working on an adverse-inspection report which would lead to termination of Plum Creek from the current-use program. During March and April, the county forester continued to take measurements at the stands to complete the adverse-inspection report.

¶ 132. The adverse-inspection report was issued on April 26, 2010, a day before the AMPs compliance letter that would allow Plum Creek to move forward. If there was any question about the continuation of the harvest after the adverse-inspection report, on May 20, 2010, the Director of Forests for FPR sent a letter to Plum Creek saying that a draft of the adverse-inspection report was being reviewed in the "Waterbury office" and had been sent to the Tax Department recommending that all Plum Creek property be removed from the UVA program. The letter stated, "Until all actions related to the potential UVA violation are completed, FPR will not be in a position to approve any new activities in the area referred to as Clough Brook North." This was a statement that no further harvesting in the relevant area would be allowed pending resolution of this case. Plum Creek interpreted it as such an order and did no further harvesting in the stands involved. That order has been in effect since May 20 and up to today. It was in effect in November 30, 2010 when the Commissioner claimed in her letter that Plum Creek was using the unharvested part of the stands to claim compliance, the rationale endorsed by the majority.

¶ 133. The majority states that this dissent wanted FPR "to wait indefinitely to see if and when the landowner will continue cutting before bringing a violation." Ante, ¶ 38 n.10. That is a mischaracterization of the facts and Plum Creek's position, as well as that of this dissent. The FPR county forester began work on the adverse-inspection report immediately after the January 26 inspection. Plum Creek never could move forward after the January 26 inspection to complete the harvest either because of the AMPs issues or because of the adverse-inspection

52

report and subsequent order denying approval for any further harvest activities. It is FPR, and not Plum Creek, that stopped harvesting activities to this day.[21]

¶ 134. In summary, the facts—if we decide it on the facts—support Plum Creek's position, not that of FPR. In the end, however, facts are for the trial court and not this Court, and the trial court considered every one of the factual assertions of the majority and either rejected them or concluded that they did not support the Commissioner's decision. We should affirm the trial court's decision.

## VI. Conclusion

¶ 135. In conclusion, I believe that this decision is wrong on multiple levels. It is wrong in determining whether FPR or Plum Creek should prevail, and is wrong in ruling as a matter of law. The superior court correctly ruled that Plum Creek never violated its plan, the standard for determining whether it should be terminated from the UVA program, and should be affirmed on that basis. It is wrong by adopting a standard of judicial review that turns a governing statute into its exact opposite. It is wrong in rewarding an administrative process that is opaque and does not contain the minimum standards of fairness. Finally, it is wrong in misusing extreme deference to emasculate judicial review. The majority's holding on standard of review has emasculated judicial review in this case.

¶ 136. I dissent. I am authorized to state that Justice Skoglund joins this dissent.

_____

Associate Justice

---

[21] The back and forth on this issue is a clear example why appellate factfinding is improper. There has never been factfinding on the question of whether Plum Creek could have completed the harvest because it was never an issue in the trial court or raised by the parties on appeal. For the reasons stated in the text, I believe that the majority's characterization of the record on this point is clearly wrong. The alternative, if there is one, is to remand to the trial court to determine the facts.

53

Relevant Content of Plum Creek Prescriptions

| Stand # | LM-03-34 | LM-03-43 | LM-03-44 |
|---|---|---|---|
| Acres | 137 | 115 | 37 |
| Total basal area (ft$^2$/acre) | 82 | 88 | 97 |
| Acceptable growing stock basal area (ft$^2$/acre) | 35 | 38 | 42 |
| Management activities | Shelterwood cut | Shelterwood cut Overstory removal cut | Intermediate thinning |
| Forest health conditions | The stand has high residual stand damage. Beech bark *Nectria* complex. | The stand has high residual stand damage. Beech bark *Nectria* complex. | The stand has high residual stand damage. Beech bark *Nectria* complex. |
| Description of stand conditions | Stand 34 is a well stocked Northern hardwood type with a total basal area of 82 ft$^2$, of that 35 ft$^2$ is acceptable growing stock. The stand is dominated by Sugar maple, Yellow birch, Beech, Balsam fir, Red Spruce. The mean stand diameter is 8.4 inches. The stand is weighted towards the medium saw timber size class. The current stand has a high level of residual stand damage and a fair amount of crown die-back. The understory varies greatly in stocking of acceptable regeneration, with small pockets of Sugar maple seedling and saplings in a patchy distribution about the stand. | Stand 43 is a well stocked Hardwood dominated mixed wood type with a total basal area of 88 ft$^2$, of that 38 ft$^2$ is acceptable growing stock. The stand is dominated by Yellow birch, Balsam fir, White birch, Red spruce, Red maple. The mean stand diameter is 8.2 inches. The stand is weighted towards the medium saw timber size class. The White birch in the stand is in severe decline and the majority of Balsam fir is mature. The majority of the stand has good stocking in Red spruce seedlings and saplings in the understory. | Stand 44 is a well stocked Northern hardwood type with a basal area of 97 ft$^2$, of that 42 ft$^2$ is acceptable growing stock. The stand is dominated by Sugar maple, Yellow birch, Beech, Balsam fir, Red spruce. The mean stand diameter is 7.6 inches. The stand is weighted towards the small saw timber size class. The stand has a fair amount of acceptable stocking in the small saw timber size class. |
| Management practices to be accomplished during next 10 year plan | Stand 34 will receive a Two Staged Shelterwood (2SS) (even age UVA code 3). The stand lacks an acceptable amount of regeneration and the majority of the overstory | Stand 43 will receive a Two Staged Shelterwood (2SS) (even age UVA code 3) and Overstory Removal (OSR) (even age UVA code 4). 30-40% of the | Stand 44 will receive an Intermediate Thinning (ITH) (even age UVA code 2). The stand is well stocked with small saw timber, however many of the |

| | | |
|---|---|---|
| is unacceptable growing stock. A low density shelterwood with a residual basal area of 30-40 ft$^2$ will be utilized to discourage the establishment of beech in the understory. The shelterwood will be irregular in distribution and will target Sugar maple and Yellow birch with large crowns to provide shade and seed distribution. The portions of the stand will also receive 1-2 acre patches where quality and stocking are not sufficient for a Shelterwood. The patches will not affect the overall stand residual basal area of 30-40 ft$^2$. | stand will receive an Overstory Removal where the overstory is in severe decline and the understory is well stocked with seedling and sapling sized Red Spruce. The remaining portion of the stand will receive a Shelterwood. The harvest will target the at-risk and mature stems. The target residual basal area is 60 ft$^2$. The harvest will release quality growing stock and provide gaps to promote regeneration. | medium and large saw timber stems are in decline. The thinning will target the at-risk and mature stems and leave a target residual basal area of 60 ft$^2$. This will release the small saw timber size class and open up gaps for regeneration. |